UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

EDWARD BENAVIDEZ, et al.,

    Plaintiffs,

    v.

CITY OF ROCHESTER, et al.,

    Defendants.

Case No. 3:21-CV-522 JD

## OPINION AND ORDER

The Plaintiffs, Edward Benavidez and Pequitti Montelongo, sued the City of Rochester, Indiana, and several of its police officers for allegedly using excessive force in arresting them on July 30, 2019. The Plaintiffs allege this use of excessive force violated their rights under the Fourth Amendment to the United States Constitution and constituted battery in violation of Indiana state law.[1] The Defendants, the City of Rochester, and Rochester Police officers James Reason[2], Matt McIntire, Matthew Hipsher, and Ben Wood, have now moved for summary judgment. (DE 24.) For these reasons the motion will be granted.

### A. Factual Background

This case begins with Mr. Benavidez going to Rochester City Hall on July 30, 2019, to complain about discoloration of the water at his residence. (DE 34 ¶¶ 5–6.) On this trip Mr.

---

[1] The complaint initially contained four counts but two of these counts were dismissed by the Court upon the motion of the Defendants. (DE 18.) As a result, only Count II, alleging state law battery against the City of Rochester, and Count III, alleging excessive force in violation of the Fourth Amendment against the individual officers, remain to be decided at the summary judgment stage.

[2] Mr. Reason holds the rank of Corporal in the Department. Hereinafter the Court will refer to him as Corporal Reason.

Benavidez brought with him a bucket of that discolored water. (*Id.*) Mr. Benavidez brought his complaint to the attention of city employees but became angry and called them names before dumping some of the water onto a city employee's desk, with some of it, intentionally or at least knowingly, also landing on an employee. (*Id*. ¶ 8.) After pouring the water, Mr. Benavidez was ordered to depart City Hall. (*Id.*) Mr. Benavidez then threw the rest of the liquid in his bucket towards a city employee before leaving. (*Id.*)

During this incident city employees requested assistance from the Rochester Police Department. (*Id.* ¶ 5.) Officer Hipsher responded to the call and was told of the verbal altercation and that Mr. Benavidez had thrown water on an employee's desk and an employee. (*Id.* ¶ 8.) Officer Hipsher and Detective Campbell of the Rochester Police then drove to Mr. Benavidez's residence where they observed Mr. Benavidez and Ms. Montelongo entering the residence as the officers approached. (*Id.* ¶ 7.) Officer Hipsher sought to make contact with Mr. Benavidez multiple times, but no one answered the door. (*Id.*)

After this unsuccessful effort to contact Mr. Benavidez, Officer Hipsher returned to City Hall and gathered further facts about the incident. (*Id.* ¶ 8.) He learned that Mr. Benavidez had, before coming in person to City Hall, made a telephone call to complain about the discolored water and remained angry and called city employees names even after the situation was explained to him. (*Id.*) Based on the information he had gathered, Officer Hipsher believed that probable cause existed to show Mr. Benavidez committed the offenses of battery and criminal mischief. (*Id.* ¶ 9.) Officer Hipsher then requested an arrest warrant for those offenses. (*Id.*) Detective Campbell went to the courthouse and obtained an arrest warrant for Mr. Benavidez based on these alleged crimes. (*Id.* ¶ 11.)

After obtaining the warrant, Officers Hipsher, Wood, McIntire, and Corporal Reason went to Mr. Benavidez's residence to serve the warrant. (*Id.*) Prior to serving the warrant, the officers believed that Mr. Benavidez owned a firearm and had previously expressed dislike towards the Rochester Police Department.[3] (*Id.* ¶ 13.) The interaction between Mr. Benavidez, Ms. Montelongo, and the officers were captured on the officers' body worn cameras.

The four officers approached the house and took positions around the front door or on the front porch with Officers Wood and McIntire standing to the right of the door while Corporal Reason and Officer Hipsher initially stood to the left of the door, further back, on a ramp which connects the porch to the driveway. (Wood Body Camera (Exh. C-1) at 0:00–1:35; Hipsher Body Camera (Exh. A-2) at 1:16.) Officer Wood then knocked on the door, rapping on the door several times in quick succession, and announcing that it was the Police Department. (Wood Body Camera (Exh. C-1) at 1:35.) When Officer Wood's initial knocking was not answered, he knocked and announced the group as the police twice more. (*Id.* at 1:51, 2:00.) Again, each knock was a series of several raps against the door. For his second and third efforts, Officer Wood intensified his knocking, delivering additional and firmer raps than his initial effort. (*Id.*) After the third knock and announce, Officer Wood also instructed Mr. Benavidez to step out of the home. (*Id.* at 2:00.)

---

[3] The Plaintiffs do not dispute the accuracy of this statement but argue that it was grounded in Mr. Benavidez's belief that he was being racially profiled by the Department. (DE 34 ¶ 13.) The record does not speak to Mr. Benavidez's prior relationship with the Rochester Police, and the nature of that relationship is not the subject of the motion. What does matter however is that Mr. Benavidez had expressed negative feelings about the Rochester Police and the officers knew of those feelings and his firearm possession when going to execute the arrest warrant. This is relevant to analyzing the totality of the circumstances in which the officers used force to arrest Mr. Benavidez as it informs how a reasonable officer would understand the potential risks faced in executing the warrant. *Burton v. City of Zion*, 901 F.3d 772, 777 (7th Cir. 2018) (the standard of reasonableness for police use of force is "whether their actions were objectively reasonable *in light of the facts and circumstances confronting them*") (emphasis added) (internal citations and quotations omitted).

After this third effort by Officer Wood, Mr. Benavidez can be heard through the closed-door inquiring "huh?" which prompted Officer Wood to repeat his instruction for Mr. Benavidez to step outside. (*Id.* at 2:07.) This call and response repeated three more times, with Mr. Benavidez calling out inquiries and responses such as "what?" (*Id.* at 2:09), "I'm not stepping outside" (*Id.* at 2:10), and "arrest warrant?" (*Id.* at 2:18) and Officer Wood repeating his instructions, with Officer Wood informing Mr. Benavidez that he has an arrest warrant on the fourth instruction.[4] (*Id.* at 2:12.)

Mr. Benavidez then inquired "warrant for what?" without opening the door despite the police's repeated instructions. (*Id.* at 2:28.) At this point Corporal Reason, now standing to the left of the front door and holding the screen door open, ordered Mr. Benavidez to step out of the home and warned if he did not, then the officers would "make entry." (*Id.* at 2:30.) Mr. Benavidez's response, through the door, is to inquire "arrest warrant for what?" (*Id.* at 2:32.) Corporal Reason, raising his voice, repeated his instruction and admonition in response. (*Id.* at 2:34.) Mr. Benavidez's response to this seventh command by the police to exit his home is to chide Corporal Reason by stating "no need to yell" through the door. (*Id.* at 2:40.) Corporal Reason repeated his instruction and warning for a third time, which brings the total number of instructions for Mr. Benavidez to exit his home to eight. (*Id.* at 2:44.)

After a brief pause with no response, Officer McIntire issued a ninth instruction. Officer McIntire identifies himself to Mr. Benavidez, stated he is an officer of the Rochester Police, that he possessed a warrant for Mr. Benavidez's arrest, and that Mr. Benavidez needed to exit the

---

[4] Between Mr. Benavidez's second and third inquiry, he makes another statement which is largely indecipherable but prompts Officer Wood to repeat his command. (*Id.* at 2:12.) In total between timestamp 2:00 and 2:19, Mr. Benavidez is instructed by the police to come outside five times, four of which were in response to his statements from inside the house.

house, or the officers would make entry. (*Id.* at 2:52.) As Officer McIntire delivered his instruction to Mr. Benavidez through the door, Ms. Montelongo appeared at the front window of the home, a few feet from the porch where the officers were standing, and stared directly at the uniformed officers. (Reason Body Camera (Exh. B-2) at 3:00.)  Mr. Benavidez responded by telling officers to "do whatever you need to do, make entry…." (McIntire Body Camera (Exh. D-1) at 2:06; Wood Body Camera (Exh. C-1) at 3:01.) Officer McIntire then instructed Officer Wood to "do it." (*Id.* at 3:02.)

Following this command, Officer Wood tried to open the front door by turning the knob, but could not do so.[5] (McIntire Body Camera (Exh. D-1) at 2:08.) Officer Wood then attempted to kick the door in, delivering three kicks which failed to breach the door before Mr. Benavidez opened the door, requesting that officers "don't break my door." (*Id.* at 2:10.) Once the door was open, Officer Wood rushed into the house followed by Officer McIntire with Corporal Reason and Officer Hipsher moving in close behind them. As the officers made entry, Corporal Reason announces that Mr. Benavidez is under arrest and twice commanded Mr. Benavidez to get on the ground. (Reason Body Camera (Exh. B-2) at 3:16.) Officers Wood and McIntire moved to detain Mr. Benavidez while Corporal Reason initially stood in the threshold observing his fellow

---

[5] This body camera footage of Officer Wood being unable to open the door squarely contradicts the Plaintiffs' version of events where they claim the door was unlocked. Thus, the Court will defer to the video evidence. "When the evidence includes a videotape of the relevant events, the Court should not adopt the nonmoving party's version of the events when that version is blatantly contradicted by the videotape." *Williams v. Brooks*, 809 F.3d 936, 942 (7th Cir. 2016) (citing *Scott v. Harris*, 550 U.S. 372, 379–80 (2007)). Further, despite Plaintiff's claim, the body camera footage of Officer McIntire does not capture Mr. Benavidez informing the officers that the door is unlocked. (*See* DE 34 at ¶19 (citing McIntire Body Camera (Exh. D-1 at 2:08.)) Further, it is immaterial to the Fourth Amendment analysis whether or not the door was locked. The officers had a valid arrest warrant for Mr. Benavidez, knew they were at his residence, and knew that he was home. They accordingly were entitled to enter the residence and execute the warrant. *Harris v. Smith*, 390 Fed. Appx. 577, 579 (7th Cir. 2010) (unpublished) (citing *Payton v. New York*, 445 U.S. 573, 603 (1980) (other citations omitted)). Moreover, and in the alternative, by telling officers "do whatever you need to do, make entry" Mr. Benavidez consented to them entering the home. When officers receive consent to enter a home and make an arrest, their entry does not violate the Fourth Amendment. *Id.* at 579–80 (citing *United States v. Walls*, 225 F.3d 858, 862 (7th Cir. 2000)).

officers, with Officer Hipsher doing the same from just behind Corporal Reason. (Hipsher Body Camera (Exh. A-2) at 2:48.)

As the officers entered the home, Mr. Benavidez, who was standing just inside the door, begins to turn away from them and towards the interior of the house. (Wood Body Camera (Exh. C-1) at 3:10.) Before he can finish turning, Officer Wood reached Mr. Benavidez and forced him to the ground, and instructed him to place his hands behind his back. (*Id.* at 3:14.) Mr. Benavidez then lay prone on the floor with his hands in the small of his back, and with Officer McIntire kneeling on the floor to his left, and Officer Wood kneeling on the floor to his right. (*Id.* at 3:20; McIntire Body Camera (Exh. D-1 at 2:20.) As the confrontation intensifies between Ms. Montelongo and the other officers, which the Court will describe momentarily, Mr. Benavidez began shouting "don't hurt her" and started to pull his left arm up and away from his back while Officer Wood was attempting to handcuff him. (McIntire Body Camera Exh. D-1 at 2:26.) Officer Wood then placed his left knee on the deltoid area of Mr. Benavidez's left arm, and left it there for around 23 seconds while he handcuffed Mr. Benavidez. (*Id.* at 2:30) Officer Wood then removed his knee from Mr. Benavidez's arm, then he and Officer McIntire helped Mr. Benavidez to his feet and walked him out of the house to a police cruiser. (*Id.* at 2:53.)

While Officers Wood and McIntire arrested Mr. Benavidez, Corporal Reason remained in the threshold of the door observing with Officer Hipsher just behind him on the porch. (Hipsher Body Camera (Exh. A-2) at 2:49.) Ms. Montelongo entered the living room where the officers and Mr. Benavidez were approximately five seconds after the officers had made entry. (Reason Body Camera (Exh. B-2) at 3:16–3:23.) Mr. Montelongo began yelling at the officers to get out of her house and began walking towards where Officers Wood and McIntire were handcuffing Mr. Benavidez. (*Id.* at 3:24.) In response Corporal Reason stepped into the living room towards

Ms. Montelongo, raising his right hand to point at Ms. Montelongo and instructed her three times to get back. (*Id.* at 3:26.) Ms. Montelongo continued to advance towards the officers and stopped just beyond Corporal Reason's outstretched hand. (*Id.*) In response to Corporal Reason's instructions, Ms. Montelongo raised her hand to point at the door and once again demanded the officers get out. (*Id.* at 3:27.) Ms. Montelongo then struck Corporal Reason's outstretched hand. (*Id.*)

Corporal Reason then moved to detain Ms. Montelongo, announcing "you're gonna go too" while trying to grab her arm, but she retreated into the living room away from officers. (*Id.* at 3:29.) Officer Hipsher and Corporal Reason followed Ms. Montelongo further into the living room, with Corporal Reason advancing on her right side and Officer Hipsher on her left. (*Id.*) Ms. Montelongo turned her back to Officer Hipsher and resisted his attempts to handcuff her by clasping her hands in front of her body. (*Id.* at 3:33.) Officer Hipsher tried to pull her arms apart and behind her back while standing behind her while Corporal Reason attempted to assist him while standing in front of Ms. Montelongo. (*Id.* at 3:34.) While doing this Corporal Reason also instructed Mr. Montelongo to place her hands behind her back. (*Id.*) Unable to separate Ms. Montelongo's hands, Officer Hipsher moved her to the ground, continuing to attempt to handcuff her while Corporal Reason grabbed and crossed her ankles. (*Id.* at 3:38.) Next, Officer Hipsher gained control of Ms. Montelongo's right arm. (*Id.* at 3:47.) Corporal Reason then released her ankles to grab onto her right wrist, twice announced that she was under arrest, and proceeded to apply his handcuffs to her right wrist. (*Id.* at 3:50.) Ms. Montelongo responded to this by ordering the police to get out of her house. (*Id.* at 3:51.) Corporal Reason then instructed Ms. Montelongo to give him her other hand three times before Officer Hipsher was able to gain control of Ms. Montelongo's left arm and move it behind her back for handcuffing. (*Id.* at 4:02.)

Officer Hipsher then placed his left knee on Ms. Montelongo's left shoulder after using both his hands to pass her left arm to Corporal Reason.[6] (*Id.* at 4:08.) Corporal Reason was then able to finish hand cuffing Ms. Montelongo and made no further contact with her after that point. (*Id.* at 4:10.) In total Officer Hipsher's knee remained on Ms. Montelongo's shoulder or back for approximately eight seconds as he secured her left arm and passed it to Corporal Reason, then steadied himself and stood up, and then assisted Ms. Montelongo in rolling over and sitting up on the floor. (*Id.* at 4:09–4:17.) For about three seconds his knee rested closer to the center of her back as he adjusted his position to stand up. (*Id.* at 4:14.) The officers then assisted Ms. Montelongo to her feet, secured the house, and escorted her to a police car. (*Id.* at 4:20, 10:30.)

Mr. Benavidez was later charged and convicted of battery and criminal mischief, both misdemeanors, stemming from the earlier incident at City Hall. (DE 26-17.) Ms. Montelongo was charged with resisting law enforcement and battery against a public safety official and entered a pretrial diversion agreement for these charges. (DE 26-18.) Mr. Benavidez and Ms. Montelongo subsequently filed this lawsuit against the Defendants on July 22, 2021. (DE 1.) Mr. Benavidez alleges the officers' actions caused injuries to his left knee, chest, aggravation of existing back problems, bruising, and scrapes. (DE 34 ¶ 42.) He fully recovered from these injuries except his knee and back problems. (*Id.*) Ms. Montelongo alleges that she suffered heart damage, requiring a heart valve replacement, and pain all over her body. (*Id.* ¶ 43.) She has fully recovered from these injuries. (*Id.*)

**B. Legal Standard**

---

[6] While this movement occurred at the edge of the video's field of view, the viewer can see the dark color of Officer Hipsher's pant leg move into position over Ms. Montelongo's brightly colored shirt.

On summary judgment, the burden is on the moving party to demonstrate that there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). That means that the Court must construe all facts in the light most favorable to the nonmoving party, making every legitimate inference and resolving every doubt in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Summary judgment is not a tool to decide legitimately contested issues, and it may not be granted unless no reasonable jury could decide in favor of the nonmoving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

However, a party opposing a properly supported summary judgment motion may not rely merely on allegations or denials in its own pleading, but rather must "marshal and present the court with the evidence she contends will prove her case." *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). There must be more than a mere scintilla of evidence in support of the opposing party's position and "inferences relying on mere speculation or conjecture will not suffice." *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 407 (7th Cir. 2009); *Anderson*, 477 U.S. at 252. Instead, the opposing party must have "evidence on which the jury could reasonably find" in his or her favor. *Anderson*, 477 U.S. at 252. Furthermore,  "[w]hen the evidence includes a videotape of the relevant events, the Court should not adopt the nonmoving party's version of the events when that version is blatantly contradicted by the videotape." *Williams v. Brooks*, 809 F.3d 936, 942 (7th Cir. 2016) (citing *Scott v. Harris*, 550 U.S. 372, 379–80 (2007)).

Further, while a court evaluating a summary judgment motion must generally construe the facts in the light most favorable to the non-moving party, that is not necessarily required if the underlying events of the plaintiff's claim are recorded. *Scott v. Harris*, 550 U.S. 372, 380

(2007). The Supreme Court instructs that if opposing parties tell two different stories, but one is blatantly contradicted by the record, so that no reasonable jury could believe it, the court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment. *Id.* at 381. As the arrests of the Plaintiffs were captured on the officer's body worn cameras, the recordings provide an impartial recollection of the events underlying this lawsuit.

### C. Discussion

The Court will first lay out the relevant legal standard for Fourth Amendment excessive force claims and apply it to the specific acts raised in this case.

It is undisputed that the Defendants possessed a warrant for Mr. Benavidez's arrest and were thus entitled to use some degree of physical force or the threat of force to carry out his arrest. "An officer who has the right to arrest an individual also has the right to use some degree of physical force or threat of force to effectuate the arrest." *Williams v. Brooks*, 809 F.3d 936, 944 (7th Cir. 2016) (citation omitted). That said, this authorization is limited by the Fourth Amendment. *Id.* As a result, excessive force claims in the context of an arrest are subject to review under the Fourth Amendment's objective-reasonableness standard. *Cyrus v. Town of Mukwonago*, 624 F.3d 856, 861 (7th Cir. 2010) (citing *Graham v. Connor*, 490 U.S. 386, 395 (1989); other internal citation omitted). This inquiry requires examination of the totality of the circumstances surrounding the arrest to determine whether the "intrusion on the citizen's Fourth Amendment interests was justified by the countervailing governmental[al] interests at stake." *Id.* (quoting *Jacobs v. City of Chicago*, 215 F.3d 758, 773 (7th Cir. 2000)).

As law enforcement officers are forced to make critical, split-second decisions in difficult and potentially explosive situations, courts review the reasonableness of the officer's actions

10

"from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* (quoting *Graham*, 490 U.S. at 396–97). The Supreme Court has directed lower courts to consider three factors in this inquiry: (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of officers or others; and (3) whether the suspect is actively resisting arrest by flight. *McAllister v. Price*, 615 F.3d 877, 881 (7th Cir. 2010) (citing *Graham*, 490 U.S. at 396).

The standard of review is the same for Ms. Montelongo. While the officers did not have a warrant for her arrest, Ms. Montelongo gave officers cause to arrest her through her act of disobeying Corporal's Reason's lawful order to step back from where officers were making an arrest and striking Corporal Reason's hand. To begin, police officers have the right to enforce lawful orders including by arresting those who verbally disobey the order and then make a movement "in furtherance of their [their] goal of disobedience." *Potts v. City of Lafayette*, 131 F.3d 1106, 113 (7th Cir. 1997). Additionally, by striking Corporal Reason while engaged in his official duty of executing an arrest Ms. Montelongo committed the Indiana offense of battery and gave the officers a basis to arrest her without a warrant. *See* Ind. Code § 35-42-2-1(c)(1), (e)(2); *Thomas v. State*, 81 N.E.2d 621, 625 (Ind. 2017) (an officer may arrest a suspect without a warrant if he observes the suspect committing a crime). Therefore, the Officers had an appropriate legal basis for arresting Ms. Montelongo and were entitled to use some physical force in effectuating her arrest.

In addition to their federal claim for alleged Fourth Amendment violations against the individual officers, the Plaintiffs bring claims under Indiana state law for battery against the officers and the City of Rochester. The Plaintiffs' Indiana state law claims rise and fall with their federal law claims as Indiana law allows for police officers to use reasonable force in order to

effect an arrest. Ind. Code § 35-41-3-3(c). This reasonableness standard is the same as the Fourth Amendment. *Martin v. City of Fort Wayne*, 2017 WL 131724, at *8 (N.D. Ind. Jan. 12, 2017) (internal citations omitted). Therefore, if the Defendants use of force was reasonable under the Fourth Amendment, it was reasonable under Indiana state law and the Plaintiffs do not have a viable state law battery claim.

### (1) Waived Alleged Acts of Excessive Force

As a preliminary matter, the Court will address several acts of force which the Plaintiffs alleged but have waived at summary judgment. The Court will group these acts by defendant and begin with Mr. Benavidez.

Mr. Benavidez initially alleged several alleged acts of excessive force, including (1) Officer Wood's takedown, (2) Officer Wood's placement of his knee on Mr. Benavidez's body, (3) Officer McIntire being involved in his takedown, (4) Officer Wood twice slammed Mr. Benavidez's head into the ground, (5) Officer McIntire being on top of Mr. Benavidez's back, legs, feet, or buttocks area, and (6) Officer McIntire crisscrossing Mr. Benavidez's legs. (DE 1 ¶¶ 21–23, 27–29.) The Defendants' motion for summary judgment, citing to the body camera video footage, argues that incidents three through six did not occur. (DE 25 at 4–10.) The Plaintiffs' response does not challenge this argument, nor does it direct the Court to any evidence that these acts occurred, therefore any such argument is waived. *Johnson v. Gen. Bd. of Pension & Health Benefits of United Methodist Church*, 733 F.3d 722, 729 (7th Cir. 2013) (holding that arguments not raised in opposition to a motion for summary judgment are waived). Moreover, the Court's review of the unambiguous video footage of the arrest shows that none of these alleged acts occurred, which provides an independent basis for granting summary judgment. As

Plaintiffs' version of events is blatantly contradicted by the video footage, the Court will defer to the facts as established by the recording. *Scott*, 550 U.S. at 380. Consequently, the only acts of alleged excessive force relative to Mr. Benavidez for the Court to review on summary judgment are: (1) Officer Wood's takedown, and (2) Officer Wood's placement of his knee on Mr. Benavidez's body.

Similarly, Ms. Montelongo alleged multiple acts of excessive force against her including (1) Officer Hipsher's takedown, (2) Officer Hipsher using his knee on Ms. Montelongo's shoulder, (3) Corporal Reason throwing or slamming her on the ground, (4) Corporal Reason stepping on her back, (5) Corporal Reason punching, twisting, pinching, or hitting her legs or feet, and (6) Officer Hipsher stepping on her back. (DE 1 ¶¶ 25; DE 26-16 at 16:4–11, 19:8–10.) The Defendants' motion for summary judgment argues, once again citing to the body camera video footage, that incidents three through six did not occur. (DE 25 at 11–14.) The Plaintiffs have not disputed Defendants' argument that these acts did not occur, as shown by the body camera footage. Therefore, these claims are waived. *Johnson*, 733 F.3d at 729. Further, the Court has independently reviewed the body camera footage and sees no evidence these acts took place. As such, the only acts of alleged excessive force relative to Ms. Montelongo for the Court to review are: (1) Officer Hipsher and takedown, and (2) Officer Hipsher using his knee on Ms. Montelongo's shoulder.

Having narrowed the scope of the motion, the Court will grant summary judgment on the waived claims, including all claims against Corporal Reason and Officer McIntire. The Court will now assess the objective reasonableness of the remaining acts of alleged excessive force by Officers Wood and Hipsher.

### (2) Alleged excessive force against Mr. Benavidez

The Court will begin with the alleged excessive force against Mr. Benavidez by Officer Wood. The Court finds that both uses of force were objectively reasonable. The Defendants are therefore entitled to summary judgment on Mr. Benavidez's claims.

First, the takedown; the decision by Officer Wood to force Mr. Benavidez to the ground in order to handcuff him and complete the arrest. Applying the *Graham* factors to this act, they collectively weigh in favor of the officers' use of force. Once again, those factors are (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of officers or others; and (3) whether the suspect is actively resisting arrest by flight. *McAllister*, 615 F.3d at 881 (citing *Graham*, 490 U.S. at 396).

As to the first *Graham* factor, the officers had a warrant to arrest Mr. Benavidez for the misdemeanors of battery and criminal mischief. While battery is somewhat serious given it involves physical contact in a "rude, insolent, or angry manner," this particular offense cannot be deemed particularly severe. Ind. Code § 35-42-2-1(c). Consequently, this factor is best described as slightly weighing in favor of the officers.

Turning to the second factor, this also weighs in favor of the officers. Officers believed that Mr. Benavidez owned a firearm, and he acknowledges he had a license to carry a firearm. (DE 34 ¶ 13) His refusal to cooperate with their instructions from inside the home raises the reasonable inference he could be retrieving or was capable of retrieving a firearm. An arrestee armed with a firearm constitutes a serious potential threat to officer safety. *See e.g., Bell v. Irwin*, 321 F.3d 637, 639 (7th Cir.2003) ("We have held that, if the suspect threatens the officer with a weapon, the risk of serious physical harm to the officer or others has been established"). Further, in situations where an arrestee is noncompliant with verbal orders and it is unclear whether he or

14

she possesses a firearm, it is reasonable for officers to use some force to ensure their safety. *See Smith v. Adams*, No. 3:18-CV-019, 2019 WL 1542298, at *8 (S.D. Ind. Apr. 9, 2019), aff'd, 804 F. App'x 390 (7th Cir. 2020) (granting summary judgment for officers after they tased a suspect who they knew might have a handgun, was noncompliant with verbal orders, and made furtive gestures by reaching for his waist).

The Court notes *Smith* is distinct in that it features officers directly observing furtive movements, where a potentially armed arrestee reached for his waistband, a common location for carrying firearms on one's person. *Id.* Here the officers could not observe Mr. Benavidez as he was inside his home. That said, the distinction does not matter because his home is a logical place for Mr. Benavidez to store a firearm and the officers' inability to see what he was doing in the home raises the possibility he was arming himself. While that did not turn out to be the case, the Court assesses the officers' actions based upon what they knew at the time they were making their decisions and not with the clarity of hindsight. *Graham*, 490 U.S. at 396–97.  As such, a reasonable officer could have anticipated a possible threat to their safety based on Mr. Benavidez's noncompliance and potential access to a firearm, and this factor weighs in favor of the officers.

The third factor weighs most strongly in support of the officers' actions. Even if Mr. Benavidez's conduct was, for the most part, best described as passive resistance, he made some affirmative acts to impede the officers. Further, while passive resistance does not entitle officers to use as much force as in cases of active resistance, it still justifies some use of force to bring about compliance. *Smith v. Ball State Univ.*, 295 F.3d 763, 771 (7th Cir. 2002) (noncompliance with orders does allow some use of force); *Wilson-El v. Majors*, 2014 WL 4594436, at *6 (S.D. Ind. Sept. 15, 2014) (finding that an arm bend maneuver was a reasonable amount of force to

subdue a noncompliant arrestee). That said, it is worth noting that Mr. Benavidez engaged in a considerable amount of passive resistance by repeatedly declining to obey the lawful commands of the officers. Moreover, the mere act of handcuffing an individual is typically not sufficient to establish an unreasonable force claim. *Avina v. Bohlen*, 882 F.3d 674, 679 (7th Cir. 2018).

Additionally, when Mr. Benavidez finally did open the door, he began to turn away from the officers towards the interior of the house. A reasonable officer could interpret that as an intention of flight or to retrieve a weapon, especially in light of his prior refusals to cooperate. Consequently, the officers' decision to force Mr. Benavidez to the ground and handcuff him was an objectively reasonable choice to bring about compliance from a suspect who had repeatedly refused to obey instructions. *Caitlin v. City of Wheaton*, 574 F.3d 361, 366–68 (7th Cir. 2009) (holding that officers tackling a suspect is a reasonable use of force when the suspect physically resisted or fled arrest); *Est. of Phillips v. City of Milwaukee*, 123 F.3d 586, 593 (7th Cir. 1997) (restraining a person in the prone position is reasonable force if the person resists arrest); *see also Becker v. Elfriech*, 821 F.3d 920, 928 (7th Cir. 2016) (noting it was likely reasonable to pull a suspect down three steps after their refusal to comply with orders); *Link v. Taylor*, 2009 WL 2216591, at *4 (N.D. Ind. July 20, 2009) (holding that the decision to handcuff a suspect, and the modest force used to accomplish that task, was objectively reasonable given the suspect had refused to cooperate with the officers' orders).

As to the action of placing a knee on Mr. Benavidez's deltoid for approximately 23 seconds, the *Graham* factors also weigh in favor of the officers. The analysis is largely the same as it was for the decision to force Mr. Benavidez to the ground. Additionally, the flight factor is supplemented by Mr. Benavidez's attempt to pull away from officers as they were handcuffing him. This small act of active resistance weighs in favor of the officers' proportional response of

briefly holding his arm in place while they finish handcuffing him. *Turner v. City of Champaign*, 979 F.3d 563, 570 (7th Cir. 2020) (finding it was reasonable force for an officer to pin a suspect's arm with his knee in light of resistance). Thus, this use of force was also objectively reasonable.

As the *Graham* factors weigh in his favor, the Court finds that the actions of Officer Wood in arresting Mr. Benavidez were objectively reasonable and did not violate his Fourth Amendment Rights. Officer Wood is consequently entitled to summary judgment on these claims.

### (3) Alleged excessive force against Ms. Montelongo

Next the Court will address the claims brought by Ms. Montelongo. The Court similarly finds that officers' uses of force were objectively reasonable, and will grant summary judgment. The Court will begin with Officer Hipsher's decision to bring her to the ground in order to handcuff her.

Applying the first *Graham* factor, Ms. Montelongo had committed the offense of felony battery by striking down Corporal Reason's outstretched hand.[7] Ind. Code § 35-42-2-1(c), (e)(2); DE 26-18 (charging documents). Felony battery seems a serious offense. But that must be tempered by the particular circumstances of this offense; a perhaps elderly woman who slapped an officer's hand. So, the first *Graham* factor only moderately weighs in favor of the officers.

---

[7] The Court would note that the Plaintiffs' briefing disputes whether this occurred and only argues from the position of what force is reasonable when a bystander is uncooperative but does not disrupt the ongoing arrest. As previously indicated, the body camera footage unambiguously shows Ms. Montelongo striking Corporal Reason. Thus, Plaintiff's arguments lack factual foundation and their cited caselaw is inapposite to the facts here.

The second factor weighs modestly in favor of the officers. As a general proposition, a third party's interference with a lawful arrest can create a safety concern for the arresting officers which they have a right to use some force to contain. *See Clarett v. Roberts*, 657 F.3d 664, 672–73 (7th Cir. 2011) (affirming use of jury instructions that indicated an officer could use reasonable force to prevent interference with a lawful arrest); *Weaver v. Combs*, 2009 WL 1111186, *4–*5 (S.D. Ind. Apr. 21, 2009) (finding that the officer had used objectively reasonable force in shoving back a bystander who was interfering with his performance of a lawful arrest). In this case Ms. Montelongo approached and berated officers as they were performing their lawful arrest of Mr. Benavidez.

Further, Ms. Montelongo ignored the commands of Corporal Reason to stay back from the arresting officers and advanced until she was an arm's length away from him, then struck his outstretched hand. The Court recognizes that balanced against this behavior are the facts that Ms. Montelongo is not a physically imposing person, she was unarmed, and she was outnumbered by Officer Hipsher and Corporal Reason. Ultimately, the looming interference of a third party as officers try to arrest an uncooperative subject poses some risk to officer safety by potentially complicating the arrest and causing the officers to divide and distract their attention from the arrest of Mr. Benavidez. While the risk here is rather small based on the totality of the circumstances, it is not inconsequential, and this factor accordingly weighs modestly in favor of the officers.

The third *Graham* factor weighs strongly in favor of the officers as Ms. Montelongo actively resisted arrest. When Officer Hipsher and Corporal Reason initially attempt to handcuff her, Ms. Montelongo clasped her hands in front of her body and resisted the officers' attempts to separate her hands and handcuff her. Ms. Montelongo's hand clasping was also directly contrary

to the officers' orders to place her hands behind her back. It is only after this initial resistance that Officer Hipsher then forces Ms. Montelongo to the ground to attempt to handcuff her. Therefore, in light of her resistance to arrest it was objectively reasonable for the officers to force Ms. Montelongo to the ground so they could handcuff her. *Smith v. Ball State Univ.*, 295 F.3d 763, 771; *Caitlin*, 574 F.3d at 366–68 (holding that officers tackling a suspect is a reasonable use of force when the suspect physically resisted or fled arrest); *Estate of Phillips*, 123 F.3d at 593 (restraining a person in the prone position is reasonable force if the person resists arrest); *Wallace v. City of Shelby*, 968 F. Supp. 1204, 1211 (N.D. Oh. 1997) (granting summary judgment to an officer who employed a leg sweep against an arrestee after she verbally refused to comply with instructions to place her hands behind her back and clasped her hands in front of her despite officer attempts to pull them apart). Viewing these factors together, they weigh in favor of the officers' actions and the Court concludes Officer Hipsher used objectively reasonable force in his takedown of Ms. Montelongo.

The Court likewise finds that Officer Hipsher's placement of his knee on Ms. Montelongo's shoulder and back for approximately eight seconds was a reasonable use of force. The consideration of the *Graham* factors is largely the same as for Officer Hipsher's decision to force Ms. Montelongo to the floor for handcuffing. Ms. Montelongo had ignored the commands of officers for her to withdraw, committed battery against a police officer, was interfering with a lawful arrest, and resisted the officers' initial attempt to arrest her. Further, the Court would note that Officer Hipsher's initial placement of his knee on her shoulder, which he held for about five seconds, was to pin her arm in place as he used both of his hands to pass her left hand to Corporal Reason. This was a reasonable use of force in light of her prior resistance. *See Turner*,

979 F.3d at 570 (finding it was reasonable force for an officer to pin a suspect's arm with his knee in light of resistance).

As the *Graham* factors weigh in favor of the officers, the Court finds their actions in arresting Ms. Montelongo were objectively reasonable and did not violate her Fourth Amendment Rights. Officer Hipsher is consequently entitled to summary judgment on these claims.

### (4) Qualified Immunity

In the alternative, the Court would also grant summary judgment to the Defendants on the basis of qualified immunity.

Qualified immunity shields government officials "from undue interference with their duties and from potentially disabling threats of liability." *Smith v. Finkley*, 10 F.4th 725, 737 (7th Cir. 2021) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 806 (1982) (internal citations omitted)). Qualified immunity provides defendants with immunity from suit, gives officials "breathing room to make mistaken judgments about open legal questions" and "protects all but the plainly incompetent or those who knowingly violate the law." *Id.* (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985); *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)). Qualified immunity is an affirmative defense, but once raised, it is the plaintiff's burden to overcome. *Id.* (internal citation omitted). To overcome qualified immunity, a plaintiff must establish (1) a violation of a constitutional right and (2) that the federal right at issue was "clearly established at the time of the alleged violation." *Id.* (citing *Tolan v. Cotton*, 572 U.S. 650, 655–56 (2014)(per curiam)). These questions can be addressed in any order, and if either is answered in the negative then the defendant is protected by qualified immunity. *Id.* (internal citation omitted).

A constitutional right is clearly established when "the right in question [is] sufficiently clear that a reasonable official would understand that what he is doing violates that right. *Smith*, 10 F.4th at 742 (quoting *Weinmann v. McClone*, 787 F.3d 444,450 (7th Cir. 2015)). The clearly defined right must be defined with "specificity." *Id.* (quoting *City of Escondido v. Emmons*, 139 S.Ct. 500, 503 (2019)). That means the reviewing court is to consider whether "precedent squarely governs the facts at issue" while remaining mindful that "we cannot define clearly established law at too high a level of generality." *Id.* (quoting *Strand v. Minchuk*, 910 F.3d 909, 917 (7th Cir. 2018)).

Bearing this standard in mind, the Court finds the Plaintiffs have not carried their burden at step two of the qualified immunity analysis. Plaintiffs briefing is extremely generic in its description of the constitutional right at issue and consequently fails to show the scope of the right, to be free from this particular conduct, is clearly established. The Plaintiffs' qualified immunity briefing argues that their right to be free from unnecessary force being used against them, as protected by the Fourth Amendment, was violated by the officers' conduct. (DE 32 at 16.) That is a fine introductory sentence and adequate restatement of a general legal protection of the Fourth Amendment confers. But it is not adequate to show that there was a clearly established right to be free of the specific conduct the officers actually perpetrated;[8] the takedowns of Mr. Benavidez and Ms. Montelongo, and the brief placement of a knee on their arm and shoulder respectively.

---

[8] The Court notes that the Plaintiffs spend a considerable part of their qualified immunity analysis rehashing their *Graham* factor analysis and restating their arguments that the Court should find a genuine dispute of material fact regarding the conduct of the arrest. The Court has already spoken on these questions, conducting its own analysis of the *Graham* factors, and finding the body camera video footage belies Plaintiff's recollection of these events.

The Plaintiffs cite no cases describing the conduct at issue here, or any type of conduct which would provide guidance on this conduct to a reasonable officer. Plaintiffs first cite to *Clash v. Beatty*, which involved a police officer shoving a subdued and handcuffed suspect into the back of a police car with such force it caused a knee injury. 77 F.3d 1045, 1047 (7th Cir. 1996). This case does not squarely govern the facts here because the officers' use of force was during the course of handcuffing Mr. Benavidez and Ms. Montelongo, not after they had already been handcuffed. Further, the gratuitous shove in *Clash* does not resemble the officers use of force in this case where the takedown and pinning of limbs were for the purposes of securing an individual.

The second case the Plaintiffs cite is *Miller v. Gonzalez* which is even less relevant. 761 F.3d 822 (7th Cir. 2014). In *Miller,* at the conclusion of a foot pursuit, the suspect was laying prone on the ground in a yard when a police officer jumped over a nearby fence, landed on the suspect's head and broke the suspect's jaw. *Id.* at 825. To compare *Miller* and this case would require an extreme level of generalization and reduce each case to the common point that they involved officers securing a suspect[9] and the use of a knee as part of the use of force. Such a generalization would go against the law and overlook the crucial factual distinctions between the cases; notably the amount of force used. Unlike *Miller* there are no allegations by the Plaintiffs that any of the officers used sufficient force to break bones. *See Smith*, 10 F.4th at 742 (noting the importance of specificity in applying allegedly governing precedent in excessive force cases given the result "very much depends on the facts of each case) (quoting *Emmons*, 139 S.Ct. at 503)).

---

[9] The Plaintiffs also argue that *Miller* is similar in that the plaintiff in that case was also only passively resisting arrest. For the reasons discussed elsewhere in this order, the Court cannot agree with the characterization that Mr. Benavidez and Ms. Montelongo engaged in only passive resistance.

While the Plaintiff's failure to carry their burden at step two of the analysis is a sufficient basis for granting qualified immunity to the officers, the Court would reaffirm that relevant caselaw indicates their use of force was within constitutional bounds based on the circumstances or not violative of a clearly established right. *See, e.g., Turner*, 979 F.3d at 570 (finding it was reasonable force for an officer to pin a suspect's arm with his knee in light of resistance); *Caitlin*, 574 F.3d at 366–68 (holding that officers tackling a suspect is a reasonable use of force when the suspect physically resisted or fled arrest); *Smith v. Ball State Univ.*, 295 F.3d at 771 (noncompliance with orders does allow some use of force).

The Court would therefore grant summary judgment to the Defendants on the alternative basis that they were entitled to qualified immunity.

### (5) Claims against the City of Rochester

Plaintiffs' claims against the City of Rochester hinge on their claims for battery against the officers in their individual capacity, as the officers took those actions during the course of their employment, under the *respondeat superior* theory of liability.[10] As the officers' use of force was reasonable under the Fourth Amendment, it is also reasonable under the terms of the Indiana Tort Claims Act and the officers, and their employer the City of Rochester, are thus entitled to immunity from the Plaintiff's Indiana law battery claims. Ind. Code § 35-41-3-3(c); *Martin v. City of Fort Wayne*, 2017 WL 131724, at *8.

---

[10] While the Plaintiffs never invoke the phrase *respondeat superior*, their allegations in Count II of the complaint (the battery claim against Rochester) refer to the officers acting *within the scope of their employment* when allegedly committing battery. This phrase is the touchstone of the *respondeat superior* analysis. *See e.g.*, *Del Real v. LaCosta, Inc.*, 2014 WL 584878, *2 (N.D. Ind. Feb. 14, 2014) (providing an overview of *respondeat superior* under Indiana law); *see also Thompson v. City of Indianapolis*, 208 F. Supp.3d 968, 977 (S.D. Ind. 2016) (allowing state law tort claims against City of Indianapolis to proceed based on *respondeat superior* liability of the City for alleged excessive force by its police officers).

**D. Conclusion**

Accordingly, the Defendants' motion for summary judgment is GRANTED. (DE 24.)

The Clerk is DIRECTED to close this case.

SO ORDERED.

ENTERED: December 19, 2023

_____/s/ JON E. DEGUILIO_____
Judge
United States District Court